# Wytheville

HURON CAMPBELL V. COMMONWEALTH OF VIRGINIA.

June 14, 1934.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*Edward Meeks* and *B. B. Campbell,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

BROWNING, J., delivered the opinion of the court.

Huron Campbell, who will hereafter be referred to as the accused or the defendant, was indicted in the Circuit Court of Amherst county, Virginia, for feloniously killing and murdering one Sam J. Mays. He was tried and found by a jury to be guilty of voluntary manslaughter and his punishment fixed at five years in the penitentiary, which verdict was sustained by the trial court.

The evidence, which is quite voluminous, will not be stated at any length. It is deemed sufficient to give a terse statement of the important facts.

The accused is a married man twenty-four years old. His family consists of himself and wife and three children, the oldest being four years old. He operates a country store in the village of Woodson, in Amherst county, and his wife and a hired girl assist him in the conduct of his business. His storehouse serves the double purpose of a residence and storeroom and the residential portion of it is occupied by himself and his family. There are doorways leading from the residence portion of the building into the store.

Sam Mays, who will hereafter be called the deceased, was also married and was survived by his wife and an infant child. At the time of his death he was nineteen years old.

The accused and the deceased were neighbors and had known each other practically all of their lives and had been friends, neither having had any ill will toward the other.

On Saturday, July 2, 1932, the deceased, in company with three of his friends, young men, went to the store of the accused in an automobile, between three and four o'clock in the afternoon. The deceased was standing on the running board in an intoxicated condition. He announced to Dick Wood, who was at the store, and who is a brother-in-law of the accused, that he was as drunk as hell and asked him what he had to do with it. The deceased and his companions then went into the store and were joined there by two other friends, young men. All of these were at the scene of the difficulty which ensued thereafter, all or a part of the time, as were the wife of the accused, the girl who worked in his household, Tommie Campbell, Dick Wood and the accused.

It may be noted that of the young men who were companions of the deceased and who testified for the Commonwealth three were his brothers-in-law and one was his first cousin. One whose name was Jesse Buck Campbell, was not related to him.

The witnesses for the defense were the accused, his wife, the hired girl, Tommie Campbell and Dick Wood. There were other witnesses for both sides who testified to matters outside of the difficulty itself. It is not deemed necessary or important to notice their testimony.

The testimony for the accused, fortified, in large measure, by that of Jesse Buck Campbell, the witness for the Commonwealth who was not related to the deceased, tended strongly to prove that the deceased, while he was in the store with his companions, purchased from the accused a bag of tobacco for which he paid a dime and

then claimed that he had lost the money, and when the accused reminded him of the purchase and suggested that that was probably the money he missed he drew from his pocket the bag of tobacco and a revolver, which he then and there exhibited in the presence of the accused and others in the store. He then engaged, with two of his friends, in a game played with what is called a "bally hoo" machine. The game was for a wage and was operated by a spring trigger which forced balls over the board and finally into pockets. The original number of balls which were shot by each player was ten but on account of some slight impairment affecting only one ball, the number at that time was nine. The deceased was loser to his adversaries and when he ascertained that one ball was missing he became angry and charged the accused with operating a crooked scheme or game and told him that the machine should be turned to the wall. He charged the accused with dishonesty and was boisterous, abusive and profane. The accused and others remonstrated with him, trying to pacify and quiet him. The accused asked him if he would not stop cursing to leave his premises, to which he replied that he did not have to go anywhere and reached back to his pocket in which he had the revolver and said: "I will go, but damn you don't follow me." Before he departed the accused went behind the counter to the back of the store and procured his gun and some shells but he did not put the shells in the gun, in fact, at no time during the altercation did he load the gun. The deceased left the storeroom and went a short distance up the road. The accused then went out and took a seat on the porch of his store and was trimming his finger nails. Three of the friends of the deceased, who had been in the store with him, met or joined him on the road and when they were some thirty feet from the accused he heard one of them say to him: "Well, if you won't listen, go your length." A short time thereafter the deceased returned and sat down on the end of the store porch. The accused got up and went into the store and in a few moments he

saw the deceased get up and quickly approach the screen door of the store with his hand in his hip pocket, whereupon he went to the door and pushed him back with his hand when the deceased caught hold of his arm and pulled him across the store porch to the ground when they clasped each other and went across the road in that position. The accused testified that the deceased released his right arm from the embrace and drew his pistol and at that time he inflicted a wound on his neck with the knife, which he had never put back in his pocket, and when he struck him with the knife he pushed him away. The deceased, presumably from the effect of the wound, dropped his pistol. He staggered with the exclamation: "I am dying." The accused went into the store and said that he had cut the deceased and was sorry but that he started to shoot him and he had to cut him to save himself. The accused asked some of the bystanders to take the wounded man to the doctor quick. He told his brother-in-law, Dick Wood, to take his car and do all he could. One of the young men took the wounded man to the nearest doctor, who happened to be absent, and there he was transferred to the automobile of the accused and taken to a hospital in Lynchburg where, a short time thereafter, he died.

The evidence for the Commonwealth was in conflict with that of the accused, except as to the testimony of Jesse Buck Campbell, heretofore referred to, which tended, in some important particulars, to support that of the accused. There are variances in the testimony of the other witnesses for the Commonwealth which are not unimportant. We may say that the conflicts in the testimony are irreconcilable.

The accused brings alleged error of the court's rulings in the following particulars:

"1. The court erred in refusing to properly instruct the jury.

"(a) As to defendant's full and complete right of self-defense and his right to act without retreating under the circumstances of this case, as developed by the evidence.

"(b) After setting forth in detail the entire evidence of the Commonwealth upon which the Commonwealth based its theory of guilt of the accused in its instruction No. 5, the court refused to give defendant's requested instruction No. 17 which would have given the jury the right to consider defendant's evidence and theory on which he sought to base his right of self-defense, and his right not to retreat.

"(c) In refusing to amend defendant's instruction No. 7 as requested.

"(d) In refusing to give any instruction as to the presumption of innocence with which the law surrounds the defendant, and especially over the objection and exception of the defendant in refusing to give his instruction No. 12 as to the presumption of innocence.

"(e) In giving instruction No. 5 for the Commonwealth without giving defendant's instruction No. 17 over defendant's exception.

"2. The court erred in refusing to set aside the verdict and grant defendant a new trial upon the motion of defendant upon the grounds of the following errors:

"(a) The verdict was contrary to the law and evidence.

"(b) For misdirection of the jury by the court as to the law of the case.

"(c) For the refusal of the court to give proper instructions to the jury offered by the defendant and the giving in lieu thereof other instructions.

"(d) Improperly refusing defendant's amendment to an instruction.

"(e) That jurors, W. J. Floyd, J. E. Cox, and W. B. Floyd, three of the members of the jury, were incompetent to try the case impartially by reason of blood relationship to the deceased and to all of the material prosecuting witnesses."

The instructions granted and rejected by the court which are the bases of contended error, and those which we deem it necessary to notice here are as follows:

Instruction No. 5, granted at the instance of the Com-

monwealth: "The court instructs the jury that in this trial for murder, the law of self-defense is the law of necessity (or apparent necessity), that is, it must have reasonably appeared to the prisoner that he was in imminent danger of being killed or done serious bodily harm by the deceased, and it must have reasonably appeared to the prisoner to be necessary to kill the deceased in order to save himself from death or serious bodily harm at the hands of the deceased. But before the prisoner can avail himself of the plea of self-defense, he must be without fault in bringing about the difficulty between himself and the deceased, and, in any case, the necessity relied on to excuse the killing must not have arisen out of the prisoner's own misconduct.

"And the court further instructs the jury that although they believe from the evidence that the deceased was at fault in going to the prisoner's store intoxicated and armed and in there bringing about the difficulty between himself and the prisoner, and in fault in standing near the store cursing and threatening the prisoner, and in fault in shortly thereafter returning while still armed with a pistol and intoxicated to the prisoner's store after he had been told to stay away by the prisoner; yet if the jury further believe beyond reasonable doubt from the evidence, that when the deceased returned to the store porch, the prisoner went out of the store and grabbed hold of the deceased, that the deceased slung him off and jerked loose, and then stepped off the porch and premises of the prisoner, that the prisoner followed the deceased and engaged him in a combat in which the deceased struck the prisoner and unbalanced him, that the deceased then backed away and retreated from the prisoner, that Dick Wood came out of the store, went to the deceased, took hold of him and held him, that while Dick Wood was holding the deceased, the prisoner advanced on the deceased and stabbed him in the neck with a knife, and that he died from said stab wound, then the prisoner cannot

plead self-defense as an excuse or justification for killing the deceased."

Instruction No. 11, asked for by the defendant but rejected: "The court instructs the jury that the law presumes every person charged with crime to be innocent until his guilt is established by the Commonwealth, beyond all reasonable doubt, and that presumption of innocence goes with the accused throughout the entire case, and applies at every stage thereof; and, if after having heard all of the evidence in the case, the jury have a reasonable doubt as to the guilt of the accused upon the whole case, or as to any fact essential to prove the charge made against him in the indictment, it is their duty to give the prisoner the benefit of the doubt, and find him not guilty."

Instruction No. 17, asked for by the defendant and rejected by the court: "The court instructs the jury that if you believe from the evidence that shortly before the fatal stabbing of the deceased by the defendant, the deceased was in the store of the defendant, that said store was a combination store and dwelling house in which the defendant with his wife and three small children resided, that the deceased was guilty of disorderly conduct in said store, in consequence of which he was ordered to leave and did leave defendant's premises, and that a short while thereafter the deceased, either came back on defendant's store porch or attempted to enter said store, whether peaceably or not, he was a trespasser, and the defendant then and there had the right to use such force as was reasonably necessary to eject him from his premises. And if you shall believe from the evidence that in the exercise of said right he pushed or caught hold of the deceased, and also that the defendant was being held by the deceased until they reached the opposite side of the road, and that the deceased then drew his pistol and that the defendant reasonably believed he was in imminent danger of death or great bodily harm and consequently cut the deceased you will find him not guilty."

■ It is elementary that both the Commonwealth and the defendant are entitled to appropriate instructions giving to the jury the law applicable to each version of the case predicated, of course, upon the evidence.

■ Instruction No. 5 told the jury the law applicable to the Commonwealth's version and based upon the evidence which was favorable to it.

Instruction No. 17 was designed to accomplish the same effect with respect to the accused. There was ample evidence upon which to base it. It should have been granted. Not to do so was error and inasmuch as no other instruction which was granted accomplished the same end its refusal was prejudicial error.

■ Instruction No. 11 embodied the principle of law relating to the presumption of innocence.

The rejection of this instruction by the court constitutes the *onus* of the Commonwealth's brief in its contention that the court's ruling was sound. The court's reason for its ruling as disclosed by the record was that its subject matter was sufficiently covered by defendant's instruction No. 3, which was granted.

This instruction is: "The court instructs the jury that the Commonwealth must prove its case beyond all reasonable doubt, and that means that the Commonwealth must prove every material element beyond sufficient doubt, which constitutes the alleged crime, and it is not sufficient that the jury may believe his guilt probable, or more probable than his innocence; no degree of probability, nor any circumstance, however suspicious, will authorize a conviction, but the evidence must be of such character as to produce a moral certainty of guilt to the exclusion of all reasonable doubt; nor are the jury to speculate, or go outside of the evidence and consider what they think might have taken place, but they are to try this case and confine it to the evidence as given by the witnesses introduced, and if that evidence, when considered along with the evidence for the defense, does not convince the jury beyond all reasonable doubt as to every material element

of the guilt of the accused, then the jury must find the accused not guilty."

We have no hesitation in holding that instruction No. 3 is not a fair substitute for No. 11. It does not pretend to cover the same proposition of law. It is an instruction based upon reasonable doubt and contains no plain, full and fair statement of the presumption of innocence to which the accused was entitled.

■ The Commonwealth's instruction No. 3, which was granted, is the stock instruction defining the degrees of murder which includes the proposition that every homicide, or unlawful killing of a human being, is presumed in law, in Virginia, to be murder in the second degree, and in order to elevate or reduce the crime to a higher or lower grade the burden is on the Commonwealth or the prisoner, respectively.

The Commonwealth perceives that this presents a counter presumption to that of innocence embodied in instruction No. 11 and that the two presumptions are conflicting and should not stand together in the same case. The effect of the contention is that the presumption attached to every homicide, or unlawful killing, should prevail over the presumption of innocence. With this view, we think, neither law nor reason is in accord.

■ This court has so often approved the instruction on the presumption of the innocence of the accused in criminal cases that it has become firmly engrafted in our jurisprudence and may be said to be a landmark of the law. We believe that it is quite universally so regarded. As recently as the year 1925 this court, through the eminent Judge Burks, in the case of *Phillips* v. *Com.*, 143 Va. 504, at page 508, 129 S. E. 259, 260, said:

"The defendant having asked an instruction on the presumption of innocence, however, the oral instruction, given by the court as a substitute for the written instruction tendered, was fatally defective in failing to instruct on the subject of presumption of innocence."

And quoting from the case of *Coffin* v. *United States*, 156

U. S. 432, 15 S. Ct. 394, 39 L. Ed. 481, as follows: "It is error for the trial court to refuse to charge the jury that the law presumes that persons charged with crime are innocent until they are proven by competent evidence to be guilty, and this error is not cured by instructing the jury that, before they could find defendants guilty, they must be satisfied of their guilt beyond a reasonable doubt."

This holding appears to answer the Commonwealth's contention that the defendant's instruction No. 3 on the subject of reasonable doubt was a sufficient substitute for the presumption of innocence instruction.

In the case of *Widgeon* v. *Com.,* 142 Va. 658, 128 S. E. 459, 461, this court, in criticizing an instruction given by the lower court, said, through Justice Campbell: "It nowhere deals with the presumption of innocence, a presumption so strong that not only is an accused entitled to the benefit of it, but if the case be a doubtful one, this presumption is always sufficient to turn the scale in his favor. *Kibler's Case,* 94 Va. 813, 26 S. E. 858. The defendant was entitled to have the jury told that the law presumed him to be innocent, and that this presumption continues until it is rebutted by the Commonwealth beyond a reasonable doubt. *Barker's Case,* 90 Va. 822, 20 S. E. 776."

In the case of *Coffin* v. *United States, supra,* that great jurist, Mr. Justice White, speaking for the court said: "Whilst Rome and the Mediævalists taught that wherever doubt existed in a criminal case, acquittal must follow, the expounders of the common law, in their devotion to human liberty and individual rights. traced this doctrine of doubt to its true origin, the presumption of innocence, and rested it upon this enduring basis. The inevitable tendency to obscure the result of a truth, when the truth itself is forgotten or ignored, admonishes that the protecion of so vital and fundamental a principle as the presumption of innocence be not denied, when requested, to anyone accused of crime."

This is a strong defense and recognition of the importance and vitality of a legal principle which the Commonwealth would have us sweep away because, forsooth, it conflicts with another presumption which, we say, is the lesser one. Perhaps, we may say, in distinguishment, that the presumption of innocence is a pure rebuttal presumption of law declared by the substantive law and that the presumption that an unlawful killing is murder in the second degree is one of law and fact which is variable according to the turn of the proof or evidence.

The two presumptions may be appropriately found existent in the same case and, indeed, there may be others, for instance, the presumption of malice, the presumption that one intends to do what he does do, and others may alike be present. The force and effect of any of them, or all of them together, is to be determined after the evidence is all in.

It was said, in the case of *Chicago, St. P., M. & O. Ry. Co.* v. *Bryant,* 65 Fed. 969, 975, 13 C. C. A. 249: "A presumption of fact is a mere inference from certain evidence, and as the evidence changes the presumption necessarily varies. A trial court is not bound to disregard a conclusive presumption which arises from all the evidence at the close of a case because at some times in the course of a trial counter presumptions arose."

"A presumption of law establishes a certainty; it is a uniform, constant rule, with conditions fixed and unvarying. * * * The policy of the law attaches a presumption of law to all men generally. A presumption of fact is such that our knowledge of human nature and affairs leads us to draw from a particular range of facts presented in a specific case. When we say a prisoner is presumed to be innocent until proved guilty, or that every man is bound to know the law, these are presumptions of law and binding upon us, however untrue and absurd they may be; but a presumption of fact depends on the proof from which it is to be inferred." *Com.* v. *Frew,* 3 Pa. Co. Ct. R. 492, 496.

We are urged by the Commonwealth that the Supreme Court of the United States, in the case of *Agnew* v. *United States,* 165 U. S. 36, 17 S. Ct. 235, 41 L. Ed. 624, repudiated the doctrine, as to the presumption of innocence, laid down in the *Coffin Case, supra.* We do not agree with the Commonwealth's interpretation of the court's holding in the *Agnew Case.* In fact, in the latter case the court approved an instruction on the presumption of innocence but rejected a second instruction on the subject because it had been covered by the first instruction and because the second instruction contained a clause at its close which the court said might tend to be misleading. The court distinguished its holding in the two cases but did not overrule the *Coffin Case,* but reaffirmed it.

In the case of *People* v. *DeFore,* 64 Mich. 693, 31 N. W. 585, 589, 8 Am. St. Rep. 863, it was said: "It is the duty of the trial judge, in a criminal case, to instruct the jury in reference to the presumptions of law applicable to the case before them, distinguishing those which are conclusive from those which are disputable. The presumption of innocence is present in every criminal case; and he should instruct the jury to that effect, and that it stands good until overcome by evidence which convinces the jury, beyond a reasonable doubt, that the respondent is guilty."

██ "It not infrequently occurs that the same facts give rise to two presumptions, and that these presumptions are in conflict one with the other. In this situation one of the presumptions must give way. Their strength should be measured and the weaker should be deemed to be overcome by the stronger. Each case will be controlled, of course, by its own facts." 10 R. C. L. 869, section 12.

██ There are other assignments of error which are not likely to occur in another trial of this case and which are not necessary to be determined. There are also assignments of error involving the court's ruling upon other instructions which we do not deem important to be discussed

since the objection to them would be largely overcome by the granting of the instructions which, we have already pointed out, should have been granted.

It follows from what has gone before that we reverse the judgment of the court and remand the case to be further dealt with as the Commonwealth may be advised, not in conflict with this opinion.

*Reversed and remanded.*